IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ELAINER N. WILLIAMS-FERGUSON, | |
| Plaintiff, | **8:19-CV-468** |
| vs. | |
| ANDREW M. SAUL, Commissioner of Social Security; | **MEMORANDUM AND ORDER** |
| Defendant. | |

This matter comes before the Court on Elainer Williams-Ferguson's Motion for an Order Reversing the Commissioner of Social Security's Decision, Filing 14, which denied her application for disability-insurance benefits. The matter also comes before the Court on the Commissioner's Motion for an Order Affirming the Commissioner's Decision, Filing 16. For the reasons stated below, the Court grants the Commissioner's motion and denies Petitioner's motion.

## I. BACKGROUND

### A. Procedural History

Elainer Williams-Ferguson applied for disability-insurance benefits, alleging disability since April 5, 2016, due to fibromyalgia, bursitis in the hips, and migraines. Tr. 12, 237. She later amended her onset date to May 25, 2016. Tr. 12. The Social Security Administration denied her claim initially on August 18, 2016, and again upon reconsideration on January 26, 2017. Tr. 12. Williams-Ferguson requested a hearing, which was held on September 26, 2018, before an administrative law judge, David Buell ("the ALJ"). Tr. 32. The ALJ denied the claim on November 29, 2018, because Williams-Ferguson retained the residual functional capacity ("RFC") to perform other work existing in significant numbers in the national economy. Tr. 24-25. Williams-Ferguson

now seeks review of the ALJ's decision as the final decision of the Commissioner under 42 U.S.C. § 405(g).

## B. Facts

Williams-Ferguson had a long history of medical treatment, dating back to late 2015. Tr. 42, 337, 1200-03. On November 13, 2015, she underwent an extensive medical workup after reporting ongoing pain in her lower extremities, including a lumbar spine imaging that showed mild diffuse facet arthropathy with no clear etiology for her complaints of pain. Tr. 337. The lumbar magnetic resonance imaging ("MRI") scan was negative for any significant abnormalities and showed no disc degeneration or focal soft tissue disc protrusion. Tr. 337.

On December 23, 2015, rheumatologist Steven Wees, M.D., examined Williams-Ferguson and stated that he "did not think she had a rheumatologic, arthritic, or musculoskeletal basis for her lower extremity symptoms." Tr. 328-32. A physical examination revealed that she had a normal neck, clear lungs, normal cardiovascular functioning with normal heart sounds and rhythm, normal gait, and normal neurological functioning with intact motor strength, intact sensory functioning, and intact reflexes. Tr. 331. Dr. Wees reported that Williams-Ferguson's musculoskeletal examination was normal both in terms of axial and peripheral findings and had no trigger points. Tr. 331. Dr. Wees's rheumatologic examination was negative, and the only abnormality noted was a positive antinuclear antibody ("ANA") screen, which Dr. Wees did not believe was related to her reported symptoms. Tr. 332.

On March 11, 2016, Williams-Ferguson saw Dr. Scott Goodman, a neurologist at the Nebraska Medical Center, for headache management. Tr. 470. He noted that the neurological examination showed some pain-related abnormalities, while otherwise appearing normal. Tr. 472. Williams-Ferguson reported three to four headache days per week, with an average severity of six

out of ten and a severity of ten out of ten at their worst. Tr. 470. However, Dr. Goodman noted that the frequency was not certain since Williams-Ferguson did not track her symptoms. Tr. 470. Dr. Goodman asked her to keep a headache calendar for the three months until her next appointment. Tr. 472. He noted she "use[d] a combination of Maxalt and naproxen" for her headache treatment, which she described as being helpful. Tr. 470. She stated that after taking them, she "then takes herself to sleep for a while." Tr. 470.

On April 8, 2016, Williams-Ferguson went to the Midwest Pain Clinic and saw Richard Hubbell, M.D., who noted Williams-Ferguson had difficulty ambulating due to lower extremity pain as well as tenderness to multiple joints and muscles. Tr. 410, 413. He also noted a full range of motion in the upper extremities, lower extremities, and spine; negative straight leg raising; and normal sensory functioning and reflexes. Tr. 413. Dr. Hubbell diagnosed Williams-Ferguson with bursitis, hip pain, and fibromyalgia. Tr. 413. Dr. Hubbell continued prescriptions of Mobic, cyclobenzaprine, Lyrica, and Percocet. Tr. 413. He recommended a healthy diet and exercise. Tr. 413.

On April 25, 2016, at an annual physical with Dr. Christine Rahn, Williams-Ferguson reported doing well overall, that her symptoms were under better control since starting her medications, and that she was getting "migraines very infrequently." Tr. 499. The physical examination was normal with no tenderness, no swelling, and a normal range of motion in the musculoskeletal system. Tr. 501. Plaintiff also had normal sensory and motor functioning, no focal neurological deficits, and her "Cranial Nerves II-XII [were] grossly intact." Tr. 501.

On May 6, 2016, Williams-Ferguson returned to Dr. Hubbell and reported that her narcotic regimen was working well "at tolerating her pain." Tr. 415. She also reported that when she finished work her legs were usually pretty swollen, that she could not walk for long periods of

3

time due to pain, and that she had to stop every so often to sit down. Tr. 415. Otherwise, the physical examination remained unchanged. Tr. 418. Dr. Hubbell continued medications and suggested Williams-Ferguson wear TED hose while at work. Tr. 418.

On May 19, 2016, Williams-Ferguson returned to Dr. Hubbell and explained her pain medication was not helping enough and that her bilateral leg and hip pain had increased. Tr. 420. Dr. Hubbell started MS Contin and hydrocodone and noted that she had "been compliant with the medication regimen and treatment plan." Tr. 423-24. There was continuing joint and muscle tenderness as well as a full range of motion, intact sensation, and intact reflexes. Tr. 423.

On June 3, 2016, Williams-Ferguson returned to Dr. Hubbell and reported the current medications were working well at masking her pain, but she still had some pain. Tr. 425. She reported her legs were swollen from when she took a vacation. Tr. 425. Dr. Hubbell performed a bilateral greater trochanteric bursa injection and continued her medications. Tr. 428-29. He also noted that she was doing well and there were no changes besides increased pain in her hips. Tr. 429.

On June 10, 2016, Dr. Goodman noted that Williams-Ferguson appeared neurologically stable, although she reported being on medical leave from work for the past two or three weeks due to her severe hip and lower extremity pain. Tr. 452. She reported "off and on" headaches seven to ten days per month, but indicated she had given up on her headache calendar and had not brought it with her. Tr. 452. Dr. Goodman noted that she walked with a cane and had a "cautious" and "slightly staggering" gait but was able to walk independently for a short distance. Tr. 453. Dr. Goodman recommended no medication changes at that time and again encouraged Williams-Ferguson to keep a headache diary. Tr. 454.

4

On June 30, 2016, Williams-Ferguson completed a questionnaire for the Social Security Disability Examiner. Tr. 260-64. She reported that her activities were limited and that she could stand for no longer than five minutes due to pain and swelling. Tr. 260-61. She stated that she had good and bad days. Tr. 260-62. On better days, she could walk on the treadmill, go grocery shopping, cook a meal, do laundry, and vacuum, although pushing the vacuum would cause her pain. Tr. 260-63. On worse days she reported having to lay in bed all day. Tr. 261-62. She stated she could sit for thirty to sixty minutes at a time before her hip started to hurt. Tr. 261.

On July 19, 2016, Williams-Ferguson sought emergency-room treatment for her hip pain. Tr. 940. She received a Toradol and Dilaudid injection and was prescribed prednisone and ondansetron. Tr. 942. On August 21, Williams-Ferguson again sought emergency-department treatment for bilateral leg pain, although her legs appeared normal on inspection. Tr. 936, 938. She was provided another Toradol injection. Tr. 938.

On August 24, 2016, Williams-Ferguson reported pain at six out of ten, so Dr. Hubbell increased her hydrocodone. Tr. 609, 613. On August 26, 2016, Dr. Rahn noted tenderness from palpation throughout Williams-Ferguson's legs and a limited range of motion due to pain in her hips, knees, and ankles. Tr. 704. Williams-Ferguson explained that physical therapy had been too painful, so Dr. Rahn recommended aquatic physical therapy. Tr. 704.

On October 15, 2016, Williams-Ferguson sought emergency-department treatment for bilateral hip and leg pain. Tr. 932. On October 17, 2016, Dr. Joel Cotton wrote a letter to Dr. Rahn explaining that based upon his review of Dr. Goodman's records, he believed there was not a neurological explanation for Williams-Ferguson's pain or apparent inability to function. Tr. 948. He explained that nothing further was planned from a neurologic standpoint for Williams-Ferguson's leg and hip pain. Tr. 948.

On December 6, 2016, Williams-Ferguson saw Dr. Jeremy Gallant, an orthopedist, who diagnosed myalgia and explained that her exam was remarkable for suspected facet arthropathy bilaterally, which could cause her back and gluteal pain. Tr. 767, 769. Furthermore, Dr. Gallant explained that her trochanteric bursa symptoms were a side effect of her "severely altered gait pattern." Tr. 767. Furthermore, he noted that Williams-Ferguson underwent a lower extremity electromyography ("EMG") procedure that was normal bilaterally; diagnostic lab work that was normal aside from a positive ANA; and imaging of the hip and pelvis that revealed some degenerative changes in the facets but was otherwise unremarkable. Tr. 765. Dr. Gallant prescribed water-based physical therapy. Tr. 767.

On December 9, 2016, Williams-Ferguson reported two headache days per week to Dr. Goodman and rated the severity as eight out of ten. Tr. 789. On December 10, she sought emergency-department treatment for her leg pain. Tr. 579-84. During the treatment, a physical examination revealed normal range of motion, normal coordination, and normal muscle tone. Tr. 581. On December 19, Dr. Gallant performed medial branch block injections. Tr. 746-47.

On December 28, 2016, Williams-Ferguson saw Dr. Marcus Snow, a rheumatologist, who reviewed Williams-Ferguson's medical history. Tr. 792, 795; *see also* Filing 15 at 11. Dr. Snow agreed with the prior assessment of fibromyalgia while noting it was "not classic given her predominantly lower extremity complaints." Tr. 795. He continued, "However, the sensitivity to the touch of her lower extremity is very classic." Tr. 795. Dr. Snow recommended Williams-Ferguson exercise daily, take the medication Savella or Cymbalta, and potentially eliminate narcotic pain medication use. Tr. 795.

On January 30, 2017, Williams-Ferguson returned to Dr. Gallant in a wheelchair and reported the medial branch blocks provided no benefit. Tr. 728. Dr. Gallant encouraged a Vitamin

D supplement and water-based physical therapy. Tr. 729. On April 24, 2017, Williams-Ferguson saw Dr. Gallant who noted no swelling, normal muscle tone, intact sensation, and slow transfer from sitting to standing. Tr. 714-15. He prescribed gabapentin. Tr. 714-15.

On May 9, 2017, Williams-Ferguson sought emergency-department treatment for migraines. Tr. 927. On May 12, she saw Dr. Goodman who reported that Williams-Ferguson's headaches had gotten worse. Tr. 796. According to Dr. Goodman, Williams-Ferguson's headaches had previously been infrequent and mild, but for the week preceding her appointment, she had been experiencing daily headaches with an average severity of eight out of ten. Tr. 796. Dr. Goodman also stated that Williams-Ferguson was well coordinated with no motor weakness and normal gait, intact reflexes, unremarkable sensory examination, and normal range of motion in the spine. Tr. 797-98. Dr. Goodman thought that she would benefit from a course of steroids for her headaches, but she declined. Tr. 798. Instead, he gave her samples of Cambia and increased her doses of Topamax and amitriptyline. Tr. 798.

On May 15, 2017, Williams-Ferguson again sought emergency-department treatment for migraines, complaining that the headache had lasted for ten days without improvement. Tr. 921. A physical examination and computerized tomography ("CT") scan were both normal. Tr. 921, 924-25.

Williams-Ferguson saw Ashley Homan, NP, on June 7 and 20, 2017, for pain management and to receive bilateral trochanteric bursa injections. Tr. 1070-73, 1075. On July 13 and August 7, she sought emergency-department treatment, first for bilateral hip pain and second for chest pain. Tr. 899, 912. On August 2, she told Homan that her current dose of medication was not working well. Tr. 1050. Homan noted that Williams-Ferguson had spinal pain elicited by touch and motion, as well as other tenderness to multiple joints and muscles. Tr. 1052-53. Homan added

7

lidocaine/prilocaine cream to Williams-Ferguson's list of prescribed medications and recommended exercises Tr. 1055.

On August 14, 2017, Williams-Ferguson saw Dr. Goodman again. Tr. 799. Williams-Ferguson reported feelings of depression and a vague desire to commit suicide, which she no longer felt. Tr. 799. Dr. Goodman noted that Williams-Ferguson's suicidal thoughts were "resolved," her "headaches [were] relatively improved, lately, compared to previous," and "she feels her pain medications are helpful." Tr. 799. The headaches ranged in severity from one at its best to eight at its worst and occurred "maybe" two to three days per week. Tr. 799. Her physical examination showed normal respiration, full range of motion in her spine, diffuse and moderate musculoskeletal tenderness, and giveaway weakness in her legs. Tr. 801. Because Williams-Ferguson was already on multiple medications including two antidepressants, amitriptyline and Savella, Dr. Goodman expressed a reluctance to start another antidepressant and he instead encouraged her to get regular exercise. Tr. 801.

After experiencing chest pain for two to three weeks, which she did not report at her August 14, 2017 appointment with Dr. Goodman, *see* Tr. 799-801, Williams-Ferguson went to the emergency department on August 17 and 28, 2017. Tr. 892-94, 883-86. At both visits, emergency-department physicians noted unremarkable findings except that one physician noted "sternal tenderness," while the other noted diffuse leg pain that was "reproducible with palpation and possibly associated with her fibromyalgia." Tr. 883, 85, 892-93. On September 15, Williams-Ferguson started physical therapy with Horizon Rehabilitation Centers. Tr. 1535.

Williams-Ferguson saw Homan again on September 27, 2017, and reported that her current medication was "not working as well" because she was experiencing pain in her legs. Tr. 1026. Homan noted Williams-Ferguson was tender to touch in many different areas and the medications

had been helping her to function but the pain had returned. Tr. 1026, 1031. However, Williams-Ferguson stated that "she has 100% relief for 4 days" from thoracic pain though "some pain" returned. Tr. 1031. Homan prescribed Sulindac and recommended continued physical therapy and exercise. Tr. 1031.

On October 17, 2017, Williams-Ferguson saw Stephen Tetrault, D.O., who stated that Williams-Ferguson's "chronic use of opioids [was] detrimental to her improvement" and not the optimal treatment for her fibromyalgia. Tr. 1495-96. Dr. Tetrault reviewed her past lab and image testing, which he noted were "all within normal limits." Tr. 1496. He increased her gabapentin prescription and started her on Cymbalta. Tr. 1496.

On October 26, 2017, Williams-Ferguson again saw Homan and stated that her "medications [were] helping her ability to function." Tr. 1019, 1024. Homan discontinued Williams-Ferguson's hydrocodone prescription but refilled her other medications. Tr. 1024. On November 2, 2017, Williams-Ferguson sought emergency-department treatment for body aches and multiple musculoskeletal pains exacerbated by exertion. Tr. 1267. She reported that her aches and pains began sixteen weeks prior. Tr. 1267. The treating physician noted tenderness on Williams-Ferguson's chest, back, and hips, and a range of motion restricted by pain. Tr. 1268. She was prescribed prednisone and gabapentin, told to rest, and discharged. Tr. 1269.

On November 10, 2017, Williams-Ferguson saw Dr. Rahn and reported continuing pain. Tr. 1482-83. Dr. Rahn noted there had been slight improvements due to water therapy and Cymbalta, but pain tended to return shortly after water therapy. Tr. 1482. Dr. Rahn recommended a more comprehensive pain-management program involving a psychologist, therapists, and physicians. Tr. 1485. On November 16, at another appointment with Homan, Williams-Ferguson reported that "her medications [were] helping her ability to function" and starting Cymbalta was

9

helpful. Tr. 1013, 1018. However, despite other prescriptions helping, Ms. Homan restarted Williams-Ferguson's hydrocodone prescription because she reported "a lot of increased pain since stopping the hydrocodone." Tr. 1018. Ms. Homan also discussed the need for Williams-Ferguson to exercise. Tr. 1018.

For Thanksgiving of 2017, Williams-Ferguson drove approximately eleven hours to Memphis, Tennessee, with her family, stopping every two hours to get up and walk. Tr. 1466. Subsequently, on November 27, she saw Dr. Rahn, with leg swelling and leg pain from the trip. Tr. 1466. Then, on December 9 and 13, Williams-Ferguson sought emergency-department treatment for chest pain, reporting sharp pain at a severity of ten out of ten. Tr. 1246, 1252.

On December 15, 2017, Williams-Ferguson saw Dr. Goodman who reported "she [was] doing fine." Tr. 1191. Dr. Goodman noted, "She reported continuing, frequent, and disabling headache symptoms as well as symptoms of general pain," but Dr. Goodman noted that "this overall [was] stable, since last visit." Tr. 1191. Williams-Ferguson reported two headaches per week that each lasted two to three days in duration, with a severity of five out of ten on average. Tr. 1191. Her physical examination revealed that she was neurologically intact with normal mental status; intact memory; and normal conversational speech, attention, and concentration. Tr. 1191-93. Moreover, the examination revealed diffuse musculoskeletal tenderness, intact coordination, normal reflexes, full motor strength, and an ability to ambulate with slight limping and antalgic gait. Tr. 1191-93.

On January 29, 2018, Williams-Ferguson saw Dr. Nadler for lower back pain management. Tr. 1131, 1135. The physical examination showed limited range of motion and pain/tenderness to multiple joints and muscles. Tr. 1135. On January 30, Williams-Ferguson followed up with Dr. Rahn who commented that testing and imaging had been unremarkable, that the cause of the chest

pain was uncertain though consistent with costochondritis, and that the pain medications had not led to any improvement. Tr. 1408, 1411. On February 5, Williams-Ferguson saw a gastroenterologist concerning her chest-pain issues. Tr. 1315-18. The gastroenterologist noted that "[s]ymptoms are most suspicious for costochondritis considering reproducible nature of this chest pain and underlying fibromyalgia" but ordered an esophagogastroduodenoscopy ("EGD") to "rule out the possibility of esophagitis." Tr. 1318.

Williams-Ferguson then saw Dr. Nadler for bilateral medial branch block injections and pain management on February 13 and 27, 2018. Tr. 1114, 1122. On March 28, Williams-Ferguson saw Dr. Nadler for a left lumbar radiofrequency ablation. Tr. 1105.

On May 4, 2018, pain-management specialist Douglas Rennels, M.D., examined Williams-Ferguson and noted that his diagnostic impression was fibromyalgia. Tr. 1583. He recommended that she discontinue morphine use and noted that "[w]e will now have her wean off her hydrocodone." Tr. 1583. Furthermore, he noted no distinct trigger points identifiable in Williams-Ferguson's neck, shoulder, or upper back region. Tr. 1583. He noted only mild lower lumbar tenderness. Tr. 1583. Otherwise, she displayed full range of motion, symmetric reflexes, and no acute distress. Tr. 1583. On May 6, Williams-Ferguson sought emergency-department treatment for persistent coughing. Tr. 1145. On June 4, Dr. Rennels increased gabapentin and provided a prescription for warm water therapy. Tr. 1580-81. On June 7, Williams-Ferguson sought emergency-department treatment at the Nebraska Medical Center for bilateral leg pain, although the physical exam showed normal musculoskeletal range of motion and no tenderness. Tr. 1566. She stated that "she [was] not taking any pain medication, whatsoever." Tr. 1569. Dr. Erica Carlsson, M.D., informed Williams-Ferguson that the Nebraska Medical Center emergency department did not treat chronic pain and that she would

11

need to obtain opiate pain medications from her primary physician or pain management physician. Tr. 1569.

On July 9, 2018, Dr. Rennels noted that despite Williams-Ferguson's reported pain level of six or seven out of ten, he did not see any indication for continued use of narcotic medication. Tr. 1578. Dr. Rennels reported that imaging showed early multilevel degenerative disc disease with mild facet arthropathy. Tr. 1578. The examination revealed intact motor strength and sensation in all extremities, full range of motion in the neck, negative straight leg raising, and diffuse tenderness in back. Tr. 1579. Dr. Rennels wrote, "She indicates that she currently is waiting to start physical therapy. She did try warm water therapy which was of some benefit." Tr. 1578.

On July 10, 2018, Williams-Ferguson saw Dr. William Palmer, a rheumatologist. Tr. 1200, 1203. He concluded "that [Williams-Ferguson's] primary rheumatologic problem is fibromyalgia" and the prior positive ANA panel was of little clinical significance Tr. 1203. Dr. Palmer believed her chest wall pain, bilateral hip bursitis, fatigue, costochondritis, migraines, and other issues were generally due to her fibromyalgia. Tr. 1203. He concluded that "the reason she is such a frequent user of health care dollars is because she hasn't understood what fibromyalgia is, is not and how it is managed." Tr. 1203. He also noted that Williams-Ferguson "really needs to exercise" and encouraged her to do yoga and swim three times a week for at least one half-hour. Tr. 1203.

On September 10, 2018, Dr. Rahn wrote a letter for Williams-Ferguson stating "[Williams-Ferguson] will likely be unable to return to work due to chronic pain and medication side effects," which "can be sedating and may require frequent rest or napping." Tr. 1589. Additionally, Dr. Rahn described that Williams-Ferguson was limited to working in

a seated position; her pain prevented her from being able to sit/stand in one position for more than thirty minutes; she was unsteady on her feet; and she used a prescribed cane for ambulation. Tr. 1589.

### C. Administrative Hearing and Findings

#### 1. Administrative Hearing

On September 26, 2018, the ALJ held a hearing on the denial of Williams-Ferguson's claim for benefits. Tr. 32. Williams-Ferguson testified that her pain started in mid-November 2015; that she was currently experiencing pain in her hips, legs, back, and arms; and that the fibromyalgia symptoms were mainly located "all over." Tr. 42, 46-47. She confirmed that she had good and bad days. Tr. 47. She confirmed that she was taking gabapentin, Baclofen, Sulindac, albuterol, Topamax, rizatriptan, amitriptyline, Linzess, Cymbalta, and Toprol-XL, as well as using a TENS unit, which were respectively prescribed for nerve pain, muscle spasms, anti-inflammation, asthma, headaches, constipation, and pain. Tr. 45-46, 48-49, 51-52, 1334-35. She stated that despite the medications, she was still experiencing fifteen headaches a month. Tr. 49. The headaches sometimes lasted two to four hours. Tr. 49. When she got a headache, she would lay down in a dark room. Tr. 49-50. She reported that the gabapentin normally put her to sleep for an hour or two every day. Tr. 51.

Williams-Ferguson testified that she could stand/sit for about ten minutes before needing to change positions. Tr. 50. She stated that her husband and kids did all the chores, laundry, and cooking. Tr. 53. She reported driving and going grocery shopping but stated that she would ride in the electric carts. Tr. 53-54. She said that she did not participate in social activities. Tr. 53-54. Williams-Ferguson also stated that she "can't even hardly lift anything up" while walking with her cane. Tr. 66.

13

Next, a vocational expert testified that there were several jobs, such as information clerk, document preparer, and charge account clerk that existed in the United States in large numbers that met the ALJ's hypothetical situation. Tr. 57. The hypothetical situation involved a worker who could perform sedentary work; was not exposed to sustained and concentrated cold temperatures, vibration, fumes, or dust; experienced no more than moderate background noise such as found in retail, medical, educational, or light manufacturing settings; used a cane; and was able to stop work one minute every thirty minutes to move around and adjust. Tr. 56-58. When asked whether a worker incapable of walking and carrying items simultaneously would be able to succeed at the three occupations offered, the vocational expert answered that she did not think they would be able to. Tr. 66.

## 2. The ALJ's Findings

On November 29, 2018, the ALJ issued a decision finding that Williams-Ferguson was not disabled. Tr. 9, 25. To determine whether a claimant is disabled, an ALJ is required to follow a five-step sequential analysis. *See* 20 C.F.R. § 404.1520(a); *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004))). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See* 20 C.F.R. § 404.1520(a).

14

Step one requires an ALJ to determine whether a claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), (b). The ALJ determined Williams-Ferguson was not and had not engaged in substantial gainful activity since her onset date. Tr. 14.

At step two an ALJ must determine whether a claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to perform "basic work activities," 20 C.F.R. §§ 404.1520(a)(4)(ii) & (c), and satisfies the "duration requirement." *See* 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522. If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Here, the ALJ determined that Williams-Ferguson had the severe impairments of fibromyalgia, degenerative joint disease, bilateral hips, degenerative disc disease, lumbar spine, chronic migraine, and obesity. Tr. 14.

For step three, an ALJ must examine whether a claimant's impairment or combination of impairments meets the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. *See* 20 CFR 404.1520(a)(4)(iii), (d), 404.1525, and 404.1526; *see also* 20 C.F.R. § 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment

"that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." 20 C.F.R. §§ 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). Here, the ALJ determined Williams-Ferguson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 15.

Step four requires an ALJ to consider the claimant's residual functional capacity ("RFC") to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), (e), (f). A claimant's RFC is "the most the claimant can do despite her limitations." *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); *see also* 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015). The RFC must (1) give appropriate consideration to all of a claimant's impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

"Past relevant work" refers to work performed by the claimant within the last fifteen years or fifteen years prior to the date that disability must be established. *See* 20 C.F.R. §§ 404.1565(a), 416.965(a). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). Here, the ALJ found that Williams-Ferguson had the RFC to perform sedentary work but was unable to perform any past relevant work. Tr. 16, 23.

In making this decision, the ALJ first explained that while Williams-Ferguson's impairment could reasonably be expected to cause the alleged symptoms, the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence in the record. Tr. 17. The ALJ stated that the physical examinations did not support the level of functional limitation alleged by Williams-Ferguson, noting that examinations generally showed she had intact range of motion and full strength in her lower extremities. Tr. 17. The examinations revealed only some giveaway weakness. Tr. 17. Furthermore, the ALJ cited the unremarkable objective medical evidence, which indicated early multilevel degenerative disc disease, mild diffuse facet arthropathy in her spine, and mild degenerative changes to her hip. Tr. 17-18. Testing had shown no other significant abnormalities. Tr. 17-18.

Next, the ALJ explained that the frequency and duration of Williams-Ferguson's migraine headaches were not supported by the evidence in the record. Tr. 18. The ALJ noted that she failed to keep a headache calendar and reported varying numbers and severities of headaches per month. Tr. 19. Furthermore, she reported satisfaction with her current treatment and that it reduced the frequency and duration of headaches. Tr. 18. The ALJ reasoned that the headaches must not have been as severe as alleged, otherwise she would have sought additional treatment or different medication. Tr. 18.

Third, the ALJ stated that Williams-Ferguson complained of nearly identical symptoms starting in November 2015 but was able to continue her light exertional work until May 2016. Tr. 18. The ALJ thought this indicated she would be able to transition to less demanding, sedentary work. Tr. 18. Moreover, Williams-Ferguson had claimed not to be involved in any social activities, but the record showed her ability to drive, accompany family while shopping, and attend treatment

visits on a regular basis. Tr. 18. The ALJ thought this contradicted her statements about participating in social activities. Tr. 18.

Lastly, the ALJ wrote that the treatment plan was relatively conservative and included water-based physical therapy, swimming, and exercise. Tr. 20-21. This, the ALJ wrote, suggested Williams-Ferguson's doctors believed she was capable of the exertion required for these activities and that the symptoms were not as severely limiting as she alleged. Tr. 20-21. Additionally, the ALJ addressed Dr. Rahn's statement that Williams-Ferguson would be unable to return to work because of the chronic pain and the medications' side effects. Tr. 23. The ALJ stated that these were speculative because they suggested that she "*may* experience these effects, rather than stating functional limitations that the claimant actually experiences due to her medications." Tr. 23. And, in a June 2018 report, there was no mention of excess fatigue, which the ALJ cited as supporting evidence that the claimant did not require frequent rest or napping. Tr. 23.

Thus, the ALJ found that Williams-Ferguson was capable of performing sedentary work if she was allowed to use a cane, stopped work for one minute every thirty minutes to change positions, and worked in an environment that would not expose her to cold, vibration, dust, or more than moderate background noise. Tr. 22. For step four in the disability analysis, this meant that Williams-Ferguson was unable to perform any past relevant work. Tr. 23.

Finally, at step five, an ALJ must determine whether a claimant is able to do any other work considering the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). If the claimant is capable of doing other work, the claimant is not disabled. Here, the ALJ determined that jobs existed in significant numbers in the national economy that Williams-Ferguson could perform, including "document preparer," "information clerk," and "charge account clerk." Tr. 24. Accordingly, the ALJ concluded that Williams-Ferguson was not disabled. Tr. 25.

## II. DISCUSSION

### A.  Standard of Review

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). The Supreme Court stated that the phrase "substantial evidence" is a "term of art" in which a court looks to an existing administrative record and asks whether it contains sufficient evidence in support of the agency's factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is 'more than a mere scintilla.' It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. at 229, 59 S. Ct. 206.)

The Court must consider evidence that both supports and detracts from the ALJ's decision and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Id.* (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)). A court should not reverse merely because it would have decided differently. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010). Moreover, the Eighth Circuit will "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (citing *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)).

19

Additionally, a court must "determine whether the [Commissioner's] decision is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citing *Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003); *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir. 1983)). No deference is owed to the Commissioner's legal conclusions. *Brueggemann*, 348 F.3d at 692 ("To the extent that [the plaintiff] attacks the ALJ's procedure, rather than the sufficiency of evidence, he states an allegation of legal error that we review de novo.").

### B. Analysis

Williams-Ferguson argues the ALJ improperly discounted her credibility without providing good reasons. Filing 15 at 2. Next, she alleges the ALJ failed to fully develop the record. Filing 15 at 23. Lastly, Williams-Ferguson argues the ALJ was not properly appointed and therefore lacked the authority to preside over her claim. Filing 15 at 26. As discussed below, this Court finds that (1) the ALJ provided good reasons, supported by substantial evidence, for his credibility determination; (2) the ALJ fully developed the record; and (3) Williams-Ferguson failed to exhaust, and therefore forfeited, her Appointments Clause challenge. Accordingly, the Court affirms the ALJ's ruling.

*1. Williams-Ferguson's Credibility*

The ALJ discounted Williams-Ferguson's credibility, concluding that her subjective complaints of pain were inconsistent with the record as a whole and not credible to the extent alleged. Tr. 17. Williams-Ferguson contends that the ALJ did not provide good reasons for finding her not credible because fibromyalgia typically yields no significant examination findings beyond tender points; her inability to follow the headache treatment plan and its lack of success are not

relevant to her complaints of fibromyalgia limitations; her leg pain caused her to miss work before she completely stopped in May 2016, so it was erroneous to suggest she lacked credibility because she was able to work prior to May 2016; and the ALJ's analysis of her ability to participate in social activities was erroneous. Filing 15 at 22-25. The Commissioner responds that the ALJ properly discussed Williams-Ferguson's symptoms and provided good reasons for finding that her statements were not entirely consistent with the record. Filing 17 at 1-2. The Commissioner argues the ALJ acted within his discretion by considering the record in its entirety and concluding the objective medical findings were normal to mild; the treatment history was conservative; Williams-Ferguson's headache complaints were inconsistent with the treatment's efficacy; Williams-Ferguson demonstrated she was capable of gainful work by working through similar symptoms prior to her onset date; she participated in daily activities; and she had not fully complied with her physicians' recommended treatments. Filing 17 at 1, 13-14. The Court finds the ALJ did not err in finding Williams-Ferguson to be not credible.

When evaluating a claimant's subjective complaints of pain, the ALJ must follow the *Polaski* factors and "consider objective medical evidence, the claimant's work history, and other evidence relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)). "[A]n ALJ need not explicitly discuss each factor, and we will defer to credibility determinations that are supported by good reasons and substantial evidence." *Id.* (citing *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011); *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)). "Credibility determinations are the province of the ALJ." *Nash v. Commissioner, SSA*,

907 F.3d 1086, 1090 (8th Cir. 2018) (quoting *Julin*, 826 F.3d at 1086). "An ALJ may decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." *Schwandt*, 926 F.3d at 1012 (internal quotation marks and citations omitted).

The issue here is whether the ALJ provided good reasons supported by substantial evidence for discrediting Williams-Ferguson's subjective complaints because they were inconsistent with the record. Each *Polaski* factor has different considerations affecting how the evidence diminishes or enhances a claimant's credibility. Since an ALJ need not explicitly discuss each *Polaski* factor, the Court will examine only the relevant factors and the parties' corresponding arguments.

     a.   Daily Activities

First, a claimant's ability to perform daily activities does not disprove disability as a matter of law, but inconsistencies between subjective complaints of pain and daily living patterns may diminish credibility. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)).

In recent cases, the Eighth Circuit has taken a strict approach in evaluating the daily activities of claimants, citing nearly any activity as proof of inconsistency. For example, in *Andrews v. Colvin*, the ALJ decided in step two that the plaintiff was severely impaired by fibromyalgia, cervical disc disease, headaches, and depression. 791 F.3d 923, 927 (8th Cir. 2015). "Andrews reported . . . that she was able to do a wide range of daily activities, including that she was able to cook, clean, drive, shop, and take care of her personal grooming and hygiene." *Id.* at 929. The ALJ found that "this evidence shows that Andrews is not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." *Id.* The Eighth Circuit upheld this determination as supported by good reasons and substantial evidence. *Id.*; *see also*

*Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) ("[The plaintiff's] activities—caring for her young son, preparing his meals, doing housework, shopping for groceries, handling money, watching television, and driving a car when necessary, among other things—showed that she could work."); *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) ("[The plaintiff's] daily activities, which included fishing and dog training, were likewise inconsistent with . . . [his] limitations."); *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (upholding ALJ's conclusion that "doing household chores, preparing meals, and going out to eat were inconsistent with [the plaintiff's] testimony about her pain"); *Edwards v. Barnhart*, 314 F.3d 964, 966-67 (8th Cir. 2003) ("[The plaintiff] can shop, drive short distances, attend church, and visit relatives . . . . Consistent with our precedents, we find substantial evidence to support the ALJ's findings with respect to [the plaintiff's] activities and alleged pain."); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (holding activities such as driving, shopping, watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain).

Here, Williams-Ferguson argues that the ALJ erred in finding that she had not credibly reported an inability to engage in social activities. The ALJ reasoned that the record did not support that Williams-Ferguson "could not be involved in any social activities, as she had testified at the hearing." Tr. 18. Williams-Ferguson stated in the administrative hearing that she was unable to "go out and do any social activities." Tr. 54. Yet, as the ALJ noted, the record shows she went shopping with her family, took a family vacation, attended church weekly, and drove herself to regular treatment visits. This level of activity is sufficient under *Andrews*, *Riggins*, *Edwards*, and other cases to weigh against a claimant's credibility when she is complaining of incapacitating symptoms. Thus, substantial evidence supports the ALJ's reasons for finding her daily activities to be inconsistent with her subjective complaints.

b. Work History

A willingness or ability to work diminishes a claimant's credibility, such as when a claimant has performed work during an alleged period of disability or has applied for unemployment compensation benefits. *Milam v. Colvin*, 794 F.3d 978, 984 (8th Cir. 2015) ("A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold [her]self out as available, willing and able to work." (alteration in original) (quoting *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991))). Also, a claimant's credibility may be diminished when she complains of symptoms that are similar to or no worse than symptoms the claimant experienced when previously working. *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) (upholding ALJ's denial of benefits, in which ALJ "noted that there was no evidence that [the plaintiff's] condition was worse after she was terminated than before").

Williams-Ferguson argues the ALJ made an erroneous inference that she was able to work from September 2015 through May 2016 while experiencing symptoms similar to those she was currently experiencing at the time of the hearing. To prove this, she cites Dr. Goodman's January 18, 2016, notes stating that Williams-Ferguson had difficulty working due to pain. However, this report is merely a recitation of Williams-Ferguson's self-reported symptoms. Williams-Ferguson provides no corroborating evidence that she was unable to work during this period.

Furthermore, Williams-Ferguson's subjective complaints at the hearing are similar to those she complained of while she was working. As the ALJ stated, this indicated that she may have been able to work through her alleged impairment and that it was not as disabling as she claimed. Tr. 18. Moreover, the ALJ did not completely discount this, but rather, considered it in determining her RFC: "Despite experiencing much the same symptoms from that point on, the

claimant was able to continue her light exertional work until May 2016, which suggests that she may be able to transition to less demanding work, within the confines of the residual functional capacity above." Tr. 18. Accordingly, the Court concludes the ALJ provided good reasons and substantial evidence to partially discount Williams-Ferguson's subjective complaints when determining her RFC.

   c.   Duration, Frequency, and Intensity of the Pain and Functional Restrictions

Due to the interrelated nature of these two *Polaski* factors, the Court will analyze them in tandem. "[I]t is error for an ALJ to disbelieve a claimant's testimony merely because there are no medical reports to provide an objective basis for the subjective report of pain." *Eichelberger*, 390 F.3d at 589 (citing *Simonson v. Schweiker*, 699 F.2d 426, 429 (8th Cir. 1983)). However, a claimant's complaints of pain that are inconsistent with claimant's past allegations or with medical evidence weigh against a claimant's credibility. *Whitman*, 762 F.3d at 705. Likewise, exaggerating a disability or symptoms will undermine a claimant's credibility. *Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014).

Fibromyalgia creates its own unique challenges and considerations because "[i]ts cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Several courts have recognized that fibromyalgia is a disabling impairment for which there are no objective tests which can conclusively confirm the disease and that it largely yields normal results—a full range of motion, no joint swelling, and normal muscle strength and neurological reactions. *Id.* at 306-07; *see also Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); *Lisa v. Dep't of Health & Human Servs.*, 940 F.2d 40, 43-

44 (2d Cir. 1991) (noting fibromyalgia is "a rheumatic disorder that eludes easy diagnosis"). The principal symptom that discriminates between fibromyalgia and other diseases of a rheumatic character are focal points of tenderness. *Sarchet*, 78 F.3d at 306. A rule of thumb is that the patient must flinch at a minimum of eleven of the eighteen focal point locations to be diagnosed with fibromyalgia. *Id.* However, "not every diagnosis of fibromyalgia warrants a finding that a claimant is disabled." *Michel v. Colvin*, 640 F. App'x 585, 596 (8th Cir. 2016) (quoting *Perkins*, 648 F.3d at 900). "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Id.* (quoting *Perkins*, 648 F.3d at 900).

*Strongson v. Barnhart* demonstrates the type of good reasons and substantial evidence required to uphold an ALJ's determination that a claimant lacked credibility due to the aforementioned factors. 361 F.3d at 1069. In *Strongson,* the plaintiff alleged fibromyalgia as a disabling impairment and testified that she was totally incapacitated. *Id.* However, the ALJ found that her testimony was inconsistent with the medical findings and course of medical treatment. *Id.* at 1072. "[T]here was no evidence that Strongson's condition was worse after she was terminated than before; the nature of her pain complaints migrated from one location to another; trigger points were not identified to support her claimed fibromyalgia; [and] tests did not support her claimed rheumatological disorders . . . ." *Id.* Examining these reasons, the Eighth Circuit held that the ALJ had adequately considered the *Polaski* factors and had provided good reasons and substantial evidence in his credibility analysis. *Id.* at 1072-73.

In *Cline v. Colvin*, the plaintiff also alleged disability because of fibromyalgia. 771 F.3d 1098, 1101 (8th Cir. 2014). Most of the plaintiff's doctors reported that she had full strength in her extremities, normal range of motion, no swelling, and only mild spine issues, in addition to no CT

26

scan or MRI results confirming the subjective complaints. *Id.* at 1100-01. However, the rheumatologist identified trigger points, which led him to diagnose the plaintiff with fibromyalgia. *Id.* at 1101. Despite the diagnosis, the ALJ largely discounted the plaintiff's subjective complaints because they were not backed by objective medical evidence. *Id.* at 1104. The ALJ cited that the plaintiff complained of bulging discs in her back despite MRI scans that did not reveal any significant abnormalities. *Id.* The ALJ also cited a doctor who concluded that the plaintiff seemed to exaggerate her symptoms. *Id.* Ultimately, the Eighth Circuit upheld the ALJ's determination that the plaintiff lacked credibility because of the lack of objective evidence, her dishonesty, and her exaggeration of symptoms. *Id.*

The present case is similar to both *Strongson* and *Cline* as Williams-Ferguson was diagnosed with fibromyalgia, but the ALJ cited that her tests yielded relatively normal results with only mild abnormalities. Tr. 17-18. Williams-Ferguson argues that fibromyalgia was her primary impairment and that because it yields no findings beyond tender points, the lack of medical evidence the ALJ cited was not relevant. However, the question the ALJ faced was not whether Williams-Ferguson had fibromyalgia, but whether the pain from her impairments was severe enough to completely prevent her from working. In answering this question, the ALJ cited numerous inconsistencies between Williams-Ferguson's testimony and the objective medical evidence, as well as a paucity of evidence to support her complaints of pain so severe as to be disabling. Contrary to Williams-Ferguson's argument, this was relevant.

The ALJ stated that "Dr. Snow noted the claimant did not have any tender joints . . . and that she displayed normal strength in her lower extremities." Tr. 20. He continued, "Dr. Snow diagnosed the claimant with fibromyalgia, but noted that it was not a classic case, given that her complaints predominately concern only her lower extremities." Tr. 20. Additionally, numerous

examinations showed only diffuse pain or no tenderness at all. Tr. 499, 501, 1191-93, 1566, 1579, 1583. Like *Strongson*, Williams-Ferguson's complaints of pain changed, and she sometimes described it as a diffuse pain, spread out across her body, rather than a typical fibromyalgia diagnosis involving focal tender points, like in *Cline*. Moreover, the ALJ found that she had an intact range of motion, full strength in lower extremities, and only some record of giveaway weakness, which did not support the intensity and limiting effects of her subjective complaints, like in *Cline*. Tr. 17; *see also* Tr. 410, 413, 423, 499, 501, 581, 795, 1566, 1583.

The ALJ went on to explain, "While the evidence in the record does not support the claimant's allegations of totally incapacitating symptoms, her obesity, in combination with the symptoms associated with fibromyalgia and her musculoskeletal impairments could contribute to her functional limitations." Tr. 21. Furthermore, "the record does not indicate that she is in distress while sitting and examinations note that she has largely intact strength and range of motion in her lower extremities." Tr. 22.

Thus, the ALJ did not entirely discount Williams-Ferguson's testimony as she argues, but rather only partially discounted it. In doing so, the ALJ cited a lack of objective medical evidence to support Williams-Ferguson's alleged incapacitation while also considering her testimony and finding she should be limited to sedentary work. Thus, this Court finds there to be substantial evidence to support the ALJ's determination that the record did not support Williams-Ferguson's claims of incapacitating symptoms.

### d.   Medication Dosage, Effectiveness, and Side Effects

A claimant's credibility may also be diminished by a conservative prescription of medication and treatments, when the impairment can be controlled through treatment or medication, or when a claimant fails to follow the treatment plan. *See Moore*, 572 F.3d at 525 (8th

28

Cir. 2009) ("The ALJ found such conservative treatments were inconsistent with [the plaintiff's] alleged disabling pain."); *see also Andrews*, 791 F.3d at 929 ("The ALJ cited supporting reasons for discounting [the plaintiff's] credibility, including [her] daily activities, her appearance at the hearing and non-compliance with medication regimens."); *see also Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) ("Finally, [the plaintiff]'s failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits.").

Williams-Ferguson was prescribed physical therapy, exercise, and water aerobics by numerous physicians. Tr. 18, 20, 502, 729, 767, 795, 859, 1203, 1535. As the ALJ stated, this evinces a conservative course of treatment. Tr. 20. It also supports the ALJ's determination that physicians perceived her as capable of the exertion required for these activities and that the symptoms were not as severely limiting as she alleged. Tr. 20.

In addition to the conservative treatment, the ALJ found that Williams-Ferguson did not completely follow her treatment. First, against a physician's direction, she failed to keep a headache calendar and track her headaches. Tr. 19, 448, 450, 470. On numerous occasions, due to this, Dr. Goodman questioned the accuracy of her reported headaches, noting that Williams-Ferguson was not certain and did not remember the details of her headache symptoms. Tr. 789, 799, 805, 814. Also, Williams-Ferguson declined a course of steroids that Dr. Goodman believed would help with her headaches. Tr. 796-98. Further, the records reflect Williams-Ferguson had to be repeatedly ordered to exercise. Tr. 20-21, 413, 795, 801, 1031, 1018, 1055. Failure to follow treatment weighs against a claimant's credibility and the ALJ cited this in discounting Williams-Ferguson's credibility.

Finally, the ALJ reasoned that Williams-Ferguson's testimony of experiencing fifteen headaches per month for two to four hours was not supported by the evidence. Tr. 18. He cited two times when she reported satisfaction with her headache treatment, on March 11, 2016, and June 16, 2018. Tr. 18. He reasoned this was inconsistent with her subjective complaints and that someone suffering such a severity of pain would seek alternative or increased medication. Tr. 18.

Williams-Ferguson argues that her headache treatment was not relevant in evaluating the credibility of her fibromyalgia-related testimony. But credibility is not evaluated on a piecemeal basis. An ALJ must consider a claimant's credibility in its entirety, guided by the *Polaski* factors. Failing to follow treatment, alleging symptoms inconsistent with her treatment success, and being prescribed conservative treatment demonstrate inconsistencies that the ALJ considered in evaluating Williams-Ferguson's credibility.

> e.   Summary

The ALJ cited inconsistencies between Williams-Ferguson's subjective complaints and the record, which, when viewed together, provide substantial evidence to support his credibility determination. Similar to *Strongson* and *Cline*, Williams-Ferguson's medical tests and imaging yielded normal results, and she complained of inconsistent, diffuse pain not probative of fibromyalgia. Furthermore, the ALJ cited evidence of success and satisfaction in Williams-Ferguson's headache treatment, which was inconsistent with her testimony. Additionally, like *Milam*, the ALJ cited the relatively conservative treatment involving exercise and water aerobics, as well as Williams-Ferguson's inability to comply with treatment, such as failing to keep a headache journal. And, like *Strongson*, the ALJ cited evidence that Williams-Ferguson complained of symptoms similar to those she had experienced when she had worked from November 2015 to May 2016. This suggested she was not wholly incapable of working. Lastly, her ability to perform

some daily activities demonstrates she was not credibly reporting the severity of her pain, as in *Andrews*. Taken together, this constitutes substantial evidence supporting the ALJ's determination that Williams-Ferguson's subjective complaints were not credible.

### 2. Whether ALJ Fully and Fairly Developed the Record

In her briefing, Williams-Ferguson argues that the ALJ did not fully and fairly develop the record, especially relating to non-physiologic contributors to her limitations, such as depression and suicidal thoughts. Filing 15 at 23. The Court finds the ALJ properly developed the record in this respect.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Combs v. Berryhill*, 878 F.3d 642, 646-47 (8th Cir. 2017) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)). "While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" *Goff*, 421 F.3d at 791 (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)); *see also Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002) ("Although [the doctor's] medical notes have numerous entries indicating office visits or telephone calls for prescription refills, as the Commissioner notes, the entries are somewhat cursory, as is the doctor's . . . letter listing [the plaintiff's] impairments and medications. In cases such as this, the ALJ was obligated to contact [the doctor] . . . ."). Also, an ALJ must not substitute his or her opinions for those of the physician. *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008); *see also Pate–Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009) ("[T]he ALJ's determination [that the plaintiff's] medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law."). Lastly, "[f]ailing to develop the record is

reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work." *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012).

In *Combs*, the plaintiff was impaired by fibromyalgia and was seen by two non-treating state-agency medical consultants who provided conflicting opinions on the plaintiff's RFC—one determined the plaintiff was capable of light work and the second, only sedentary work. 878 F.3d at 644-46. The ALJ decided to credit the opinion of the first physician, Dr. Keith, because the ALJ found Dr. Keith's opinion more consistent with the record as a whole. *Id.* at 645. To support this assertion, the ALJ relied on his own inference as to the relevance of the plaintiff's treating physician's notations that the plaintiff was in "no acute distress" and had "normal movement of all extremities." *Id.* The ALJ consequently gave Dr. Keith's opinion greater weight than the other physician's and determined the plaintiff was capable of light work and, therefore, not disabled. *Id.* However, the Eighth Circuit held that the ALJ erred by relying on his own inferences of the treating physician's notations and that the ALJ should have contacted the medical providers for clarification. *Id.* at 647. By failing to do so, the ALJ did not satisfy his duty to fully and fairly develop the record. *Id.*

Here, Williams-Ferguson argues that because she was on antidepressants and reported suicidal thoughts, the ALJ should have more fully developed the record as to whether a non-physiological impairment contributed to her limitations. But here, the issue was not undeveloped. Unlike *Combs*, the ALJ did not substitute his own inferences or conclusions, nor did he play doctor. As to the suicidal thoughts, the ALJ cited the appointment with Dr. Goodman, who noted that she had no plan, she did not feel suicidal, and that the issue was resolved. Tr. 15, 799. Moreover, the ALJ explained that Williams-Ferguson had declined a psychiatry appointment referral and she had consistent examinations in which her mood and affect were normal with no noted mental

abnormalities. Tr. 15. Accordingly, there is substantial evidence that the ALJ fully developed the record with regards to a non-physiological impairment.

### 3. Appointments Clause

Lastly, Williams-Ferguson argues the ALJ that "heard [her] claim was not properly appointed by a Department Head or the President" under the Appointments Clause and thus, the ALJ's denial of benefits should be vacated and her claim should be "remanded for a new hearing before a new, constitutionally appointed, ALJ." Filing 15 at 26-31. The Commissioner responds that, "at no point in the administrative process . . . did [Williams-Ferguson] ever present" this argument. Filing 17 at 16-17. As a result, the Commissioner argues her challenge to the ALJ's appointment is untimely, and she therefore forfeited her Appointments Clause claim. Filing 17 at 16-17. In support of her argument, Petitioner relies on *Cirko on behalf of Cirko v. Commissioner of Social Security*, 948 F.3d 148, 152, 159 (3d Cir. 2020), in which the Third Circuit Court of Appeals "decline[d] to require exhaustion" when the petitioners "had not previously presented their Appointments Clause Challenges to their ALJs or the Appeals Council and thus had not exhausted those claims before the agency." However, Williams-Ferguson acknowledges "that resolution of this issue could be on its way" in the Eighth Circuit Court of Appeals given the consolidation of several cases raising the same issue. Filing 15 at 27-28.

On June 26, 2020, the Eighth Circuit addressed the issue of whether failure to raise an Appointments Clause challenge before the SSA resulted in forfeiture. *Davis v. Saul*, No. 18-3422, 2020 WL 3479626, at *1 (8th Cir. June 26, 2020). Similar to Williams-Ferguson, the petitioner in *Davis* argued that "constitutional claims need not be exhausted." *Id.* at *3. Addressing this argument, the Eighth Circuit noted that "[o]ther circuit courts have disagreed on whether exhaustion of the Appointments Clause issue before the SSA is required." *Id.* at *2 (comparing

*Carr v. Comm'r, SSA*, 961 F.3d 1267 (10th Cir. 2020) (no exhaustion required), with *Cirko on behalf of Cirko*, 948 F.3d 148 (exhaustion required)). However, the court concluded that exhaustion was required, and this was not "'one of those rare cases in which we should exercise our discretion' to consider a non-exhausted claim." *Id.* at *4 (quoting *Freytag v. Comm'r*, 501 U.S. 868, 879, 111 S. Ct. 2631, 2639, 115 L. Ed. 2d 764 (1991)). Shortly thereafter, the Eighth Circuit again declined to consider a different petitioner's challenge to his ALJ's appointment because the petitioner "did not raise to the ALJ an Appointments Clause challenge." *Hilliard v. Saul*, No. 19-1169, 2020 WL 3864288, at *2 (8th Cir. July 9, 2020) (citing *Davis*, 2020 WL 3479626); *see also Keck v. Saul*, No. 8:18CV476, 2020 WL 3868874, at *13 (D. Neb. July 9, 2020) (citing *Davis* and finding that the petitioner "forfeited his Appointments Clause challenge by failing to raise it during his administrative proceedings" regardless of whether an emergency measure instructing ALJs to acknowledge but not address challenges based on the Appointments Clause was in effect at the time of the petitioner's claim).

Given the Eighth Circuit's clear precedent of declining to consider Appointments Clause challenges not raised and exhausted at the administrative level, the Court likewise declines to do so. "[Williams-Ferguson] did not raise to the ALJ an Appointments Clause challenge, so this court need not consider it." *Hilliard*, 2020 WL 3864288, at *2.

### III. CONCLUSION

For the foregoing reasons, the Court affirms the Commissioner's final decision denying Williams-Ferguson's claim for benefits and denies Williams-Ferguson's request for reversal or remand.

IT IS ORDERED:

1. The Commissioner's Motion for an Order Affirming the Commissioner's Decision, Filing 16, is granted;

2. Petitioner's Motion for an Order Reversing the Commissioner of Social Security's Decision, Filing 14, is denied;

3. The Commissioner's final decision is affirmed;

4. A separate judgment will be entered.

Dated this 29th day of July, 2020.

BY THE COURT:

Brian C. Buescher
United States District Judge